**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

BONNY FLERLAGE, *et al.*,

      Plaintiffs,

      v.

VILLAGE OF OSWEGO, *et al.*,

      Defendants.

Case No. 13-cv-6024

Judge John Robert Blakey

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Bonny Flerlage, Tyler Flerlage, Alexia Flerlage, and Austin Decowski sue Defendants Village of Oswego and numerous Oswego police officers for alleged civil rights violations stemming from the officers' response to a 911 call. Plaintiffs allege that Defendants, among other things, used excessive force against them in violation of 42 U.S.C. § 1983. Plaintiffs filed their fifth amended complaint in April 2015. [123]. Defendants moved for summary judgment on all claims except Bonny's excessive force claim. [215]. For the reasons explained below, this Court grants Defendants' motion in part and denies it in part.

## I.    Background

The facts here come from Defendants' Local Rule 56.1 statement of material facts [216] and Plaintiffs' Local Rule 56.1 statement of additional facts [231].

On August 24, 2011, Decowski drank seven to ten beers over the course of the night, ending up at a Buffalo Wild Wings in Oswego with his friend Blake Osborne. [216] ¶¶ 7–8. They decided to start walking home from the restaurant around 11:30

1

p.m. *Id.* ¶ 10. Decowski's mother, Bonny, drove to pick them up and brought Decowski's teenaged half-siblings, Alexia and Tyler, in the car with her. [231] ¶¶ 4–5; [216] ¶ 12. When the Flerlages arrived to find Decowski and Osborne on the side of the road, Decowski "became enraged" and Bonny yelled at him to get in the car. [216] ¶¶ 13–14. Tyler testified that his brother fought against getting in the car "because he didn't know who we were" and stumbled towards the street, so Tyler either tripped Decowski or pulled him to the ground to prevent him from entering the street. [216-2] at 42. Tyler then sat on top of his brother. *Id.*

A passerby pulled over near the Flerlages and asked if they needed help. [216] ¶ 16. At Bonny's request, that passerby drove Osborne away from the scene. *Id.* ¶ 18. Shortly after, another passerby called 911 upon seeing the Flerlages and reported a fight occurring on the side of the road involving "at least five people." *Id.* ¶ 19; [231] ¶ 17. Defendant Officer Melhouse arrived on the scene first. [216] ¶ 21. The parties dispute what Melhouse saw when he arrived: Defendants claim that Tyler remained sitting on top of Decowski, *id.* ¶ 22, while Plaintiffs say that Decowski lay on the ground with Tyler next to him. [231] ¶ 19. As Melhouse arrived, Decowski grabbed Alexia's leg—either to brace himself to stand up or to pull her down—and Alexia fell to the ground. [216] ¶ 23; [231] ¶¶ 14–15. The parties dispute most of the events from this point forward.

### A. Police Interactions with Decowski and Tyler

Defendants say that Melhouse told the brothers to stop struggling with each other as he approached and then pushed Tyler off of his brother so he could arrest

2

Decowski. [216] ¶ 24. But Plaintiffs say that Melhouse yelled "Get the fuck out of the way" and started beating Decowski without warning. [231] ¶ 26. Decowski then lunged at Melhouse from the ground, grabbing Melhouse's waist near his gun and baton. [216] ¶ 27. Decowski pled guilty to grabbing Melhouse in a criminal case, but the other Plaintiffs all deny that Decowski grabbed Melhouse. [230] ¶ 27. Melhouse admits to striking Decowski in the face several times with a closed fist after Decowski attacked him. [216] ¶ 28. Plaintiffs (besides Decowski) say that Decowski remained lying on the ground while Melhouse attacked him without reason. [231] ¶ 26. At some point, Decowski lost consciousness. *Id.* ¶ 27. Plaintiffs say that Melhouse continued punching the unconscious Decowski. *Id.* ¶ 28.

Tyler then pushed Melhouse, who tripped over the unconscious Decowski. *Id.* ¶ 31. Tyler swung a closed fist at Melhouse, who blocked Tyler's punch and struck him in the face. *Id.* ¶¶ 33–34. Defendants say Melhouse hit Tyler with a closed fist, *id.* ¶ 34, but Plaintiffs say he used a flashlight. [231] ¶ 31.

Defendant Officer Nehring arrived on the scene around 12:10 a.m. [216] ¶ 26. He saw Tyler swing at Melhouse, and left his vehicle to tackle Tyler in response. *Id.* ¶ 35. According to Defendants, when Tyler resisted Nehring, Nehring hit him in the face with a closed fist. *Id.* ¶¶ 36–37. Plaintiffs, however, say that both officers punched an unresisting Tyler multiple times. [231] ¶¶ 41–42. During the altercation with Tyler, Bonny and Alexia screamed. [216] ¶42.

Melhouse then turned towards Decowski and radioed for emergency medical help, reporting an "unresponsive, but breathing" person to dispatch. *Id.* ¶¶ 38–39.

Plaintiffs acknowledge that Melhouse radioed for aid, but say he pushed Alexia—who stood next to Decowski—to the ground before calling for help. [231] ¶ 44. Unsurprisingly, Defendants' account differs; they say that Melhouse merely moved Alexia out of the way. [216] ¶ 43.

Sergeant Bond and Officers Graver and Dilg then arrived at the scene. *Id.* ¶¶ 44. At some point before the other officers arrived, Nehring had "secured" Tyler. *Id.* ¶ 44. Bond asked Nehring what happened, and Melhouse joined the discussion. [231] ¶ 48. Nehring then turned off the radio recorder for a few minutes. *Id.*

Paramedics arrived shortly after Bond, Graver, and Dilg. [216] ¶ 45. Defendants say that paramedics immediately tried to examine Decowski, and Decowski regained consciousness, struck a paramedic in the knee, and behaved belligerently, threatening officers and paramedics and spitting and flailing to prevent paramedics from coming near him. *Id.* ¶¶ 46–47. Thus, Defendants say, the paramedics could not treat him. *Id.* ¶ 48. Plaintiffs say that paramedics never tried to examine Decowski and instead stood near him and taunted him even though he remained calm. [231] ¶¶ 52, 54. After Robert Flerlage—Bonny's husband and Decowski's stepfather—arrived on the scene, he signed a "refusal of medical treatment" form for both Decowski and Tyler. [216] ¶ 49.

Unknown (or unspecified) officers placed Decowski in a police van with a spit hood on his head. [231] ¶ 60. Decowski testified that he dry-heaved while in the van and felt like he could not breathe. *Id.* ¶ 61. Decowski asked the transporting officer to remove the hood; that officer refused and told Decowski to "stop fucking

puking." *Id.* ¶ 62. Melhouse's testimony reveals that he rode in the van with Decowski, but Melhouse denies swearing at Decowski. [236] ¶ 60.

## B. Police Interactions with Bonny and Alexia

The exact timing remains unclear, but at some point during these events Bond escorted Bonny and Alexia to the other side of the street to move them away from Decowski and Tyler. [216] ¶ 55. Bond overheard Bonny on the phone with someone. *Id.* ¶ 56. Dilg crossed to Bonny's side of the street then, and Dilg and Bond told Bonny to get off the phone and hang up. *Id.* ¶ 57. The parties agree that Bonny gave the phone to Alexia without hanging up the call, but dispute whether she did so to comply with the officers' orders or to avoid complying. *Id.* ¶ 58.

Dilg told Alexia to get off the phone and then reached for the phone. *Id.* ¶¶ 59–60. Defendants claim that Alexia resisted Dilg's orders and held tight to the phone after he reached for it. *Id.* ¶ 62. Plaintiffs say Alexia simply did not have time to respond before Dilg reached for the phone, and that she released the phone when he grabbed it. [231] ¶ 74.

Bonny reached for the phone at the same time Dilg did; Defendants say she also grabbed Dilg's hand and pulled on his arm, while Plaintiffs say that Bonny and Dilg merely "made physical contact with each other." *Id.* ¶ 73; [216] ¶ 63. During her criminal trial, however, Bonny testified: "I grabbed his hand reaching for the phone." [216-23] at 147.

The officers then arrested Bonny and put her in Nehring's squad car; they detained Alexia during her mother's arrest. *Id.* ¶ 66. The officers kept Alexia in

handcuffs and told her to sit on the ground—Defendants say only for a few minutes—until they released her to her father when he arrived on scene. *Id.* ¶ 66; [231] ¶ 80.

For the course of Dilg and Bond's interaction with Bonny and Alexia on the far side of the road, Nehring, Melhouse, and Graver remained on the opposite side of the road with Tyler and Decowski. [216] ¶ 68. Graver never interacted with Bonny or Alexia; Dilg and Nehring never interacted with Decowski. *Id.* ¶¶ 69–71.

### C. Arrests and Criminal Cases

Officers arrested Decowski and Tyler and charged both with various crimes. [216] ¶¶ 51–52. Tyler pled guilty to one count of aggravated battery and stipulated to the following factual basis for his plea: "On August 25, 2011, he [Officer Melhouse] was dispatched to a fight in progress. As he was trying to disrupt—to break up the fight—the minor raised his fist and ran towards Officer Melhouse again and punched at him thereby placing him believing [sic] that he would receive a battery as to that, and that Officer Melhouse was performing his duties as an officer and was wearing a uniform at the time." *Id.* ¶ 53.

Decowski pled guilty to one count of aggravated assault and stipulated to the following factual basis for his plea: "On or about the date in question, August 25, 2011, Officer Melhouse from the Oswego Police Department was attempting to place Mr. Austin under arrest. While he was trying to do so, Mr. Austin grabbed Officer Melhouse by the leg and waist area while Officer Melhouse was performing acts authorized by law. He was, in fact, a police officer at the time." *Id.* ¶ 54.

Officers arrested Bonny and charged her with battery and obstructing or resisting a peace officer. *Id.* ¶ 67. She was acquitted of both charges after a trial. [231] ¶ 83.

### D. Alexia's Bankruptcy Filings

Alexia filed for Chapter 7 bankruptcy in January 2017. [216] ¶ 72. At that time, the parties had completed a significant amount of discovery in this case. *Id.* Yet Alexia denied under oath that she owned any legal claims, and the bankruptcy court discharged her debts in April 2017. *Id.* ¶¶ 73–74. Alexia reopened her bankruptcy case in November 2017 and filed amended schedules listing this lawsuit as an asset. [243-1] at 1.

## II. Legal Standard

Courts should grant summary judgment when the moving party shows that no genuine dispute exists as to any material fact and the evidence weighs so heavily in the moving party's favor that the moving party "must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also* Fed. R. Civ. P. 56. A genuine dispute as to a material fact exists when, based upon the evidence, a reasonable jury could find for the non-moving party. *Anderson*, 477 U.S. at 248. To show a genuine dispute as to a material fact, the non-moving party must offer "particular materials in the record," and cannot rely upon the pleadings or speculation. *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014).

Courts must evaluate evidence in the light most favorable to the non-moving party and refrain from making credibility determinations or weighing evidence.

*Rasho v. Elyea*, 856 F.3d 469, 477 (7th Cir. 2017) (citing *Anderson*, 477 U.S. at 255). The moving party bears the burden of establishing the absence of genuine disputes as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III. Analysis

Plaintiffs assert five § 1983 claims: excessive force (Count I, all Plaintiffs); false arrest (Count II, Bonny and Alexia); conspiracy (Count III, all Plaintiffs); failure to intervene (Count IV, Decowski, Bonny, and Tyler); and denial of medical attention (Count V, Decowski). Bonny and Decowski also assert an indemnification claim against the Village of Oswego (Count VI). This Court first addresses whether Alexia has standing and then addresses each count in turn.

### A. Alexia's Standing

Defendants argue that judicial estoppel bars Alexia from pursuing her claims in this case because she failed to disclose them to the bankruptcy court before that court discharged her debts. [217] at 26. Alexia responds that judicial estoppel does not apply because she amended her bankruptcy schedules to disclose this case as an asset and will pursue her claims on behalf of her creditors. [229] at 33.

This Court addresses standing first. Defendants do not challenge Alexia's standing to pursue her claims, but even without a challenge this Court has "an independent obligation to confirm its jurisdiction." *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1269 (2015). Article III limits federal courts to resolving cases and controversies, and a plaintiff must have standing throughout a case. *Davis v. FEC*, 554 U.S. 724, 732 (2008).

Filing for Chapter 7 bankruptcy creates a bankruptcy estate and sweeps a debtor's "legal or equitable interests" at the time of filing into the bankruptcy estate. 11 U.S.C. § 541(a). Those interests include causes of action. *In re Polis*, 217 F.3d 899, 901 (7th Cir. 2000). After property becomes part of the Chapter 7 estate, the appointed trustee "has sole authority to dispose of property, including managing litigation related to the estate." *Cable v. Ivy Tech State College*, 200 F.3d 467, 472 (7th Cir. 1999). Thus, "*only* the trustee has standing" to pursue a claim belonging to the estate. *Id.* Although trustees may abandon legal claims, a claim that the debtor did not schedule and that the bankruptcy court did not administer before the case closed "forever remains property of the estate," leaving the trustee as the true party in interest. *Matthews v. Potter*, 316 F. App'x 518, 521 (7th Cir. 2009).

Here, Alexia owned her claims against Defendants when she filed for bankruptcy. She and her co-plaintiffs filed their § 1983 claims against Defendants in August 2013, [1], more than three years before Alexia filed for bankruptcy in January 2017, [216] ¶ 72. Thus, when Alexia filed for bankruptcy, her claims in this case became part of her Chapter 7 estate even though she did not schedule them. *See Biesek v. Soo Line R.R. Co.*, 440 F.3d 410, 413 (7th Cir. 2006). And because Alexia did not schedule the claims before the bankruptcy court discharged her debts and closed the case, the claims "forever" remain the estate's property. *Matthews*, 316 F. App'x at 521. Only the Chapter 7 trustee has standing to pursue the claims. *Cable*, 200 F.3d at 472.

Amending the bankruptcy schedules in November 2017 did not grant Alexia standing. To avoid dismissal for lack of standing, Alexia would have to show that the estate's trustee abandoned the legal claims in this case. *See Esparza v. Costco Wholesale Corp.*, No. 10-cv-5406, 2011 WL 6820022, at *4 (N.D. Ill. Dec. 28, 2011). Alexia bears the burden of establishing standing because she seeks to invoke this Court's jurisdiction. *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003). She fails to meet that burden. Alexia does not allege—in any brief or in the declaration she filed—that the trustee abandoned these claims.

This Court dismisses Alexia's claims because she lacks standing to pursue them. *See Esparza*, 2011 WL 6820022, at *3 (dismissing claims for lack of standing in similar circumstances); *Biesek*, 440 F.3d at 413 (If the trustee "had abandoned this claim then Biesek could have prosecuted the suit in his own name."). For the rest of the opinion, "Plaintiffs" refers to Bonny, Tyler, and Decowski.

## B. Count I: Excessive Force

Plaintiffs claim that Defendant Officers used excessive force against them while responding to the 911 call. Defendants do not move for summary judgment on Bonny's excessive force claim, but argue that *Heck v. Humphrey*, 512 U.S. 477 (1994), bars Decowski and Tyler's excessive force claims because they seek relief that would render their criminal convictions for aggravated assault and aggravated battery invalid. [217] at 10. Alternatively, Defendants argue that the officers used reasonable force, or that the officers have qualified immunity. *Id.* at 7–11.

### 1.    Whether *Heck* Bars These Claims

*Heck* holds that a § 1983 plaintiff may not recover on claims for allegedly unconstitutional actions when the unlawfulness of those actions would necessarily "render a conviction or sentence invalid," unless the plaintiff proves that the conviction was reversed on direct appeal, expunged, declared invalid by an authorized state tribunal, or "called into question" by a federal court issuing a habeas writ.  512 U.S. at 486–87.  Thus, *Heck* prevents plaintiffs from collaterally attacking criminal convictions through civil suits.  *McCann v. Neilsen*, 466 F.3d 619, 621 (7th Cir. 2006).  But *Heck* does not "affect litigation about what happens after" a plaintiff completes his crime.  *Gilbert v. Cook*, 512 F.3d 899, 901 (7th Cir. 2008).

Tyler pled guilty to aggravated battery against Melhouse, and stipulated to running at Melhouse while raising his fist and then swinging at Melhouse.  [216] ¶ 53.  Tyler does not dispute those facts here; his claim takes issue with the ensuing events.  Evaluating the evidence in the light most favorable to Tyler as the non-moving party, *Anderson*, 477 U.S. at 255, the following things happened *after* Tyler swung at Melhouse: (1) Melhouse blocked Tyler's fist and punched him in the face; (2) Nehring arrived on the scene and tackled Tyler, ostensibly after Melhouse punched Tyler in the face; and (3) Melhouse and Nehring punched Tyler multiple times even though Tyler did not resist.  [231] ¶¶ 31–42.

None of those allegations would invalidate Tyler's conviction if a jury found for him on his excessive force claim.  *Heck* bars only claims that *necessarily* imply a conviction's invalidity.  *Gilbert*, 512 F.3d at 902.  Nothing bars presenting an

argument along the lines of: "The police violated my rights by punching me repeatedly after I stopped resisting, regardless of whether I swung my fist first." *See id.* Thus, *Heck* does not bar Tyler's excessive force claim.

Decowski pled guilty to aggravated assault against Melhouse, and stipulated to grabbing Melhouse by the waist and leg while Melhouse tried to arrest him. [216] ¶ 54. Decowski does not dispute that plea, but in an attempt to circumvent it, he seeks to rely on his family's statements that he never grabbed Melhouse or resisted in any way. [230] ¶ 27. Setting aside the circumvention issue (for now), and taking the evidence in the light most favorable to Decowski, *Anderson*, 477 U.S. at 255, the following things happened *after* Decowski grabbed Melhouse: (1) Melhouse hit Decowski in the face several times; (2) Decowski fell unconscious and Melhouse continued punching him; and (3) Melhouse left a spit hood on Decowski after Decowski dry-heaved and told Melhouse that he had trouble breathing. [231] ¶¶ 26, 28, 60–62.

Plainly, *Heck* bars any contention—from Decowski or his family—that Decowski never grabbed Melhouse by the waist and leg. That contention entirely invalidates the factual basis for Decowski's conviction. But one *Heck*-barred allegation does not invalidate Decowski's entire claim. *See Evans v. Poskon*, 603 F.3d 362, 364 (7th Cir. 2010) (dismissing one of the plaintiff's contentions as *Heck*-barred while allowing others to proceed). Rather, this Court "must carve off any *Heck*-barred contentions and proceed with what remains." *Mordi v. Zeigler*, 870 F.3d 703, 708 (7th Cir. 2017). *Heck* does not bar any claims about what happened

*after* Decowski completed his crime of grabbing Melhouse. *Gilbert*, 512 F.3d at 901. Decowski may challenge the amount of force Melhouse used to respond to Decowski grabbing him by the waist, and he may challenge the force Melhouse used in punching him after he went unconscious and in keeping a spit hood on him after he complained about his breathing.

### 2. Whether Defendants Used Reasonable Force

Courts analyze claims for excessive force during "an arrest, investigatory stop, or other seizure" under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 388 (1989). An officer used excessive force if, "judging from the totality of the circumstances at the time" of the seizure, the officer used more force than necessary to seize the plaintiff. *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012). The Fourth Amendment requires an objective inquiry that ignores the individual officer's motives or intent. *Id.* at 520. Courts must analyze the objective reasonableness of an officer's actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," while accounting for the fact that police sometimes need to make "split-second judgments" in tense situations about how much force to use. *Weinmann v. McClone*, 787 F.3d 444, 448–49 (7th Cir. 2015) (quoting *Plumhoff v. Rickard,* 134 S. Ct. 2012, 2020 (2014)).

At this stage of the proceedings, the record indicates that some of the force that Tyler alleges, even if it occurred in response to Tyler swinging at Melhouse, could be unreasonable. Under Tyler's version of the facts, he offered no physical resistance to the officers besides running at and swinging at Melhouse. And the

bare fact of resistance does not preclude a finding that an officer used excessive force; the normal factors for evaluating the use of force still apply. *Gregory v. Oliver*, 226 F. Supp. 2d 943, 951 (N.D. Ill. 2002); *see also O'Leary v. Luongo*, 692 F. Supp. 893, 903–04 (N.D. Ill. 1988). Construing the facts in Tyler's favor, when the officers used force upon him, Decowski remained on the ground unconscious while Bonny and Alexia stood off to the side screaming intermittently. [231] ¶¶ 28–42. Thus, two officers confronted one teenager who had swung at one of them, but then ceased resisting. Under those circumstances, the force alleged—tackling and punching—exceeded what would have been objectively reasonable to subdue Tyler. *See Morfin v. City of East Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) (overturning summary judgment for the defendant officers where the plaintiff's version of the facts indicated that officers "grabbed him, twisted his arm, shoved him toward the wall and took him to the floor" even though he did not resist).

Likewise, some of the force that Decowski alleges would be unreasonable even in response to him grabbing Melhouse by the waist and leg. Decowski's strongest allegation is that Melhouse punched him repeatedly *after* knocking him unconscious. Knowingly using any force against an unconscious person, as asserted here, is objectively unreasonable.

Defendants, of course, dispute Plaintiffs' version of events wholesale. In the end, Defendants' version of events might be right, but deciding that would require this Court to make a credibility determination that properly belongs to the jury,

"not the district court judge at summary judgment." *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003).

This Court notes that both sides argue about what the dash camera video from August 24 shows, with Defendants claiming that the video wholly exonerates them and Plaintiffs claiming the video fully supports their story. Defendants also object to the "Enhanced Dash Camera Video" that Plaintiffs submitted because Plaintiffs did not provide that enhanced video to Defendants and did not disclose it during discovery. [236] at 12. Ordinarily, Federal Rule of Civil Procedure 37 dictates that a party that fails to disclose information required under Rule 26 may not use that information "to supply evidence on a motion," unless the failure to disclose "was substantially justified" or "harmless." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

Although this Court disapproves of Plaintiffs' failure to disclose the enhanced video and provide a copy to Defendants, this Court declines to exclude the enhanced video for the purposes of this motion, because the failure to disclose did not harm Defendants. Neither the enhanced video nor the original footage provide enough clarity for this Court to rely upon them in any material way to support either side's version of events, given the relatively low quality and the frequency with which some individuals on screen block other people from view. Accordingly, the question of whether Defendants used excessive force still depends upon which version of events a finder of fact believes; this Court cannot make that credibility determination at summary judgment. *Payne*, 337 F.3d at 778.

### 3. Qualified Immunity

To determine whether an officer is entitled to qualified immunity at summary judgment, courts ask two questions: (1) "whether the facts alleged, taken in the light most favorable" to the non-moving party, show that the officer violated a constitutional right; and (2) whether that right was clearly established at the time of the alleged violation. *Payne*, 337 F.3d at 775. These questions need not be answered in that order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

If, as Tyler and Decowski allege, Melhouse and Nehring used excessive force against them, then those officers violated Decowski and Tyler's constitutional rights. They also violated clearly established law on the use of excessive force. Some force can be so plainly excessive that courts do not require analogous cases demonstrating that the level of force violated a clearly established right. *See Weinmann*, 787 F.3d at 451. Generally, affirmative testimony that officers repeatedly punched an unconscious person or a non-resisting person falls within this category. A reasonable officer would have known that such conduct would violate the Fourth Amendment. More factual development at trial might reveal a different story. But at summary judgment—where this Court must draw inferences in favor of the non-moving party—Defendants fail to show that they possess qualified immunity. *See Payne*, 337 F.3d at 780. This Court denies summary judgment for Defendants on Count I.

## C.      Count II: False Arrest

Bonny claims that officers falsely arrested her and detained her without justification.  Defendants argue that they had probable cause to arrest Bonny for aggravated battery.  [217] at 19.

To prevail on her false arrest claim, Bonny must show that officers arrested her without probable cause; probable cause provides an absolute defense to a false arrest claim.  *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009).  Indeed, probable cause for an arrest on *any* offense precludes a § 1983 false arrest claim, regardless of whether probable cause existed for the arresting offense. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 762 (7th Cir. 2006); *see also Devenpeck v. Alford*, 543 U.S. 146, 154 (2004).  Probable cause for an arrest exists when the facts and circumstances at the time of the arrest—viewed from the perspective of a reasonable person in the officer's shoes—warrant a prudent person believing that the suspect committed, is committing, or will commit a crime. *Gonzalez*, 578 F.3d at 537.  If reasonable minds could differ over the facts or the resulting inferences, the probable cause determination belongs to the jury.  *Id.*

Under Illinois law, a person commits a battery by knowingly and without legal justification making physical contact "of an insulting or provoking nature" with someone else.  720 ILCS 5/12-3(a).  If the victim is a known peace officer, battery automatically becomes aggravated battery.  720 ILCS 5/12-3.05(d)(4). Although Plaintiffs claim that Bonny and Dilg "merely made physical contact with each other" as they both reached for the phone, [231] ¶ 73, Bonny testified at her

criminal trial that she "grabbed his hand reaching for the phone," [216-23] at 147. Bonny may not create an issue of fact here by contradicting her own sworn testimony. *See Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001). For purposes of this motion, she grabbed Dilg's hand.

Illinois adheres to the common-law rule that even slight contact may constitute a battery. *Garcia-Meza v. Mukasey*, 516 F.3d 535, 538 (7th Cir. 2008). Thus, even minor contact between an arrestee and an officer can create probable cause for battery. *Gill v. Vill. of Melrose Park*, 35 F. Supp. 3d 956, 963 (N.D. Ill. 2014). Of course, this rule does not mean "that *any* contact with a civilian—an accidental brush at Taste of Chicago, an inadvertent bump on the El, or an incidental shoulder while exiting Wrigley Field—may be deemed an insult or provocation sufficient to justify an arrest for battery." *Id.* at 964.

Applying Illinois' minimal standards for battery, unless no reasonable officer in Dilg's position could have interpreted Bonny's grab as insulting or provoking, Dilg had probable cause to believe that Bonny committed battery. *See id.* Whether physical contact qualifies as insulting or provoking depends upon the context in which that contact occurs. *People v. Peck*, 633 N.E.2d 222, 223 (Ill. App. Ct. 1994). Even accepting Plaintiffs' view of the facts, the officers dealt with a dangerous and hectic scene with two people who physically resisted them and lashed out at them. Regardless of Bonny's subjective intentions, a reasonable officer in Dilg's position could have interpreted Bonny's grab as an indication that she decided to physically resist orders—in other words, as provoking.

Nor does the minimal amount of force that Bonny used save her false arrest claim. The Seventh Circuit has observed that Illinois law requires so little force for battery that "an individual angry at being given a parking ticket might crumple up the ticket and throw it on the ground and face charges of aggravated battery if the ticket hit the issuing officer's shoe." *Garcia-Meza*, 516 F.3d at 538; *see also Gill*, 35 F. Supp. 3d at 965 (collecting cases). Bonny did more than hit Dilg's shoe with a piece of paper. This Court grants summary judgment to Defendants on Count II.

### D.     Count III: Conspiracy

Plaintiffs claim that Defendant Officers conspired to deprive them of their constitutional rights. Defendants argue that Plaintiffs fail to provide evidence of any agreement among the officers to violate their constitutional rights.

To succeed on a § 1983 conspiracy claim, Plaintiffs must show that: (1) individuals reached an agreement to deprive them of their constitutional rights; and (2) overt acts in furtherance of the conspiracy actually deprived them of those rights. *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). Given the clandestine nature of conspiracies, Plaintiffs may rely upon circumstantial evidence to establish a conspiracy. *Id.* (citing *Cooney v. Casady*, 735 F.3d 514, 518 (7th Cir. 2013)). They may not, however, rely upon speculative evidence. *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003).

Here, Plaintiffs cannot survive summary judgment on this claim because they offer only speculative evidence. Their conspiracy claim hinges upon "a secret conclave between Dilg, Bond, and Melhouse" during which the officers cut their

audio feeds. [229] at 35. Defendants agree that Nehring turned off the audio for about two minutes. [231] ¶ 48. Without more, that evidence alone cannot establish a conspiracy among the officers. *See Seniff*, 342 F.3d at 785 (explaining that evidence of numerous phone calls between alleged conspirators "merely proves that the individuals remained in contact" and offers nothing more than speculation) (internal quotation marks omitted).

Plaintiffs protest that Dilg, Bond, and Melhouse could have agreed during their conclave to attack Bonny and Alexia, arrest Bonny, and blame Decowski for the lack of medical care. [229] at 35. True. They also could have discussed any number of other subjects, rendering Plaintiffs' arguments purely speculative. Rule 56 mandates granting summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. This Court grants summary judgment to Defendants on Count III.

### E.    Count IV: Failure to Intervene

Plaintiffs claim that one or more Defendant Officers failed to intervene to prevent violations of their constitutional rights.

An officer fails to intervene if he has both reason to know that another officer's actions constitute excessive force and "a realistic opportunity to intervene to prevent the harm from occurring." *Abdullahi v. City of Madison*, 324 F.3d 763, 774 (7th Cir. 2005) (internal quotation marks omitted). That "realistic opportunity" exists if an officer could and should have cautioned the officer using excessive force

to stop.  *See id.*; *see also Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).  A failure to intervene claim generally presents questions of fact appropriate for the jury; a court should not decide it at summary judgment if the underlying excessive force claim remains unresolved.  *Abdullahi*, 423 F.3d at 774.

Heeding *Abdullahi*'s caution, this Court cannot decide Plaintiffs' failure to intervene claims at summary judgment based upon this record.  Decowski and Tyler's excessive force claims survive summary judgment, and Defendants did not seek summary judgment on Bonny's excessive force claim.  As those claims proceed to trial, the failure to intervene claims will accompany them.  This Court denies summary judgment for Defendants on Count IV.

### F.      Count V: Denial of Medical Attention

Decowski claims that Defendant Officers denied him necessary medical care in an objectively unreasonable manner and showed deliberate indifference to his medical needs.  Defendants argue that they behaved reasonably because Melhouse summoned an ambulance for Decowski.  [217] at 26.  Alternatively, they argue that qualified immunity protects them against Decowski's claim.  *Id.* at 27.

#### 1.      Standard

Decowski claims that Defendants exhibited "deliberate indifference" to his medical needs, evoking the standard that governs Eighth Amendment claims of cruel and unusual punishment.  But Decowski cannot make an Eighth Amendment claim because he was not a convicted prisoner at the time of the alleged violation. *See Williams v. Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007).  Rather, the Fourth

Amendment governs Decowski's claim. *See Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006). Thus, Decowski can prevail by showing that Defendants behaved objectively unreasonably under the circumstances. That standard demands less of plaintiffs than the Eighth Amendment's deliberate indifference standard. *Id.*

### 2. Whether Defendants Behaved Unreasonably

Four factors guide courts in assessing whether an officer responded reasonably to an arrestee's medical needs: (1) notice of the medical needs, whether by communication or observation; (2) severity of the medical needs; (3) scope of requested treatment, balanced against the severity of the medical needs; and (4) police interests, a wide-ranging factor that includes "administrative, penological, and investigatory concerns." *Rodriguez*, 509 F.3d at 403. That said, courts should "not fixate on factors" at the expense of the overarching principle that officers "must do more to satisfy the reasonableness inquiry" when they confront an apparent, serious medical condition and they have no legitimate interest in delaying treatment. *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 600 (7th Cir. 2011).

Plaintiffs agree that Melhouse radioed for medical aid right after he and Nehring subdued Tyler. [231] ¶ 44. That means Melhouse called an ambulance promptly after both Decowski and Tyler could no longer fight him. Promptly calling an ambulance "will typically qualify as reasonable." *Florek*, 649 F.3d at 601. Officers dealing with arrestee's medical issues "will either procure treatment, provide treatment, or both." *Id.* at 599. Here, Melhouse procured treatment.

Plaintiffs say that they believe Melhouse canceled his call for an ambulance at some point. [231] ¶ 57 ("At approximately 12:15 a.m., with Plaintiffs believing Melhouse to have canceled his call for an ambulance, Alexia used her phone to call her father.") But Plaintiffs admit that paramedics arrived on scene about five minutes after Alexia called her father, meaning they arrived about ten minutes after Melhouse originally radioed for aid. *Id.* ¶¶ 39, 50. Even if Melhouse canceled his call as Plaintiffs allege, that cancellation had no practical effect on Decowski receiving aid. To state a claim under § 1983, Decowski must allege that Melhouse deprived him of a federal constitutional right. *Savory v. Lyons*, 469 F.3d 687, 690 (7th Cir. 2006). If Melhouse's actions did not affect Decowski's medical care, then Melhouse did not deprive Decowski of a federal constitutional right because he did not interfere with Decowski's right to medical attention (nor did any other officers, about whom Decowski makes no specific allegations related to his medical care). This Court grants summary judgment to Defendants on Count V.

### G.    Count VI: Indemnity

Bonny and Decowski assert a state-law indemnification claim against the Village. They fail to specify which state's law applies here; this Court presumes Illinois law, given the forum and the fact that Illinois has the most significant contacts with the parties and events in this case. *See Mass. Bay Ins. Co. v. Vic Koenig Leasing Inc.*, 136 F.3d 1116, 1122 (7th Cir. 1998). Defendants argue only that the indemnification claim fails because all of Plaintiffs' § 1983 claims fail. In

other words, the Village seeks summary judgment to the extent that this Court grants summary judgment to the Village's officers on any underlying claims.

The Village faces potential liability under the indemnification provision of 745 ILCS 10/2-109, which makes local public entities responsible for damages arising from their employees' liability. On any claim for which the Village's employees are not liable, the Village cannot be liable. *See, e.g.*, *Miles v. Vill. of Dalton*, No. 15-cv-5017, 2016 WL 1161293, at *8 (N.D. Ill. Mar. 23, 2016). Thus, this Court grants summary judgment to the Village on Counts II, III, and V. The Village remains potentially liable for Counts I and IV.

### H. Officers Graver and Kern

Plaintiffs do not allege that Officer Graver did anything wrong related to the claims that remain live. Graver arrived at the scene after the events that Decowski and Tyler claim constituted excessive force, [216] ¶ 44, so Graver cannot be liable either for excessive force or for failure to intervene as to those plaintiffs. As for Bonny, Graver never interacted with her; indeed, Graver remained on the opposite side of the road for the entirety of the altercation between Bonny and Dilg. *Id.* ¶ 70.

Except for discussing claims this Court already dismissed, Plaintiffs mention Graver in their brief only to describe when Graver arrived to the scene, not to allege wrongdoing. *See* [229] at 12. The factual record similarly fails to show how Graver could be liable for excessive force against Bonny or failure to intervene between Bonny and Dilg. Rule 56 mandates granting summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. This Court grants summary judgment to Graver.

Similarly, Plaintiffs do not allege that Officer Kern did anything wrong. In fact, neither side mentions Kern in briefs or fact statements, although Kern remains on the docket as a defendant. Given the generic manner in which Plaintiffs asserted some claims against "all of" the Village's officers, Kern might not have understood any need to seek summary judgment. Regardless, this Court has the power to grant summary judgment to Kern because Plaintiffs had notice that they needed to come forward with all of their evidence to respond to this motion. *Celotex*, 477 U.S. at 326. This Court grants summary judgment to Kern on its own motion.

## IV. Conclusion

This Court grants Defendants' motion for summary judgment [215] in part and denies it in part. This Court dismisses all of Alexia Flerlage's claims because she lacks standing. This Court grants Defendants' motion as to Counts II, III, and V. This Court denies Defendants' motion as to Counts I (with the exception of Alexia Flerlage's claim), IV, and VI (to the extent officers remain potentially liable on the underlying claims).

Dated: November 30, 2017

Entered:

_____
John Robert Blakey
United States District Judge

25